## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

MONICA MARCHEGIANI,                           :
                                              :
                        Plaintiff,            :
                                              :   3:14-CV-00568
            v.                                :   (JUDGE MARIANI)
                                              :
AETNA LIFE INSURANCE CO. and                  :
URS FEDERAL SERVICES,                         :
                                              :
                        Defendants.           :

## MEMORANDUM OPINION

### I.   Introduction

Presently before the Court are Cross-Motions for Summary Judgment (Docs. 24; 25)

in this dispute over short-term disability benefits under the Employee Retirement Income

Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq. For the reasons that follow, the

Court will enter summary judgment in favor of the Defendants and against the Plaintiff.

### II.   Statement of Facts

The following facts are undisputed. They come from alternatively from the parties'

Statements of Material Fact accompanying their Summary Judgment Motions or from the

Administrative Record, which the parties jointly submitted to the Court as "the definitive

record." (*See* Defs.' Mot. for Summ. J., Appendix, Doc. 25-3, at 1 n.1.) As the definitive

record, there is no dispute over what the Administrative Record says, though the parties do

dispute the interpretations that should be accorded to it. While the parties do raise many disputes and denials to their opponent's Statements of Material Facts, all of these disputes and denials pertain to the weight of certain evidence, the correct interpretation of it, or the justifiability of certain actors' decisions throughout the case. There does not appear to be, however, any dispute as to the facts of what actually transpired in this case, regardless of the judgments that the parties may make about those facts. Therefore, the Court considers all facts in this case to be undisputed. Those facts are as follows.

The Plaintiff, Monica Marchegiani, worked for Defendant URS Federal Services as a Supply Technician beginning on August 29, 2011, which was a "sedentary" physical demand occupation. (Defs.' Statement of Undisputed Material Facts, Doc. 27, at ¶ 1 (citing Administrative Record, Doc. 26, at 40).) URS acted as Plan Administrator for an ERISA-governed employee benefit plan, which was self-funded through a Voluntary Employee Benefit Association ("VEBA") trust. (*Id.* at ¶¶ 2-3 (citing Administrative Record at 22-37, 53).) Defendant Aetna Life Insurance Company contracted with URS to provide administrative services for the Plan, including to administer Short-Term Disability ("STD") claims. (*Id.* at ¶¶ 4-5 (citing Administrative Record at 1-21, 36).) Aetna was a fiduciary pursuant to Section 502 of ERISA, and obtained complete authority from URS to make final decisions on initial claims and appeals for benefits. (*Id.* at ¶¶ 5-6 (citing Administrative Record at 9).)

To be eligible for weekly STD benefits under the Plan, a claimant "must be unable to perform the material duties of her own occupation solely due to injury, illness or pregnancy."

2

(Pl.'s Statement of Facts, Doc. 24-1, at ¶ 4 (citing Administrative Record at 178, 224).) A "disability" is "a non-work related illness or injury that prevents the claimant from working for a period longer than a week but no longer than 180 days." (*Id.* at ¶ 5 (citing Administrative Record at 224).)

Plaintiff entered Moses Taylor Hospital on December 18, 2012. (*Id.* at ¶ 6 (citing Administrative Record at 388-90); Defs.' Resp. to Pl.'s Statement of Facts at ¶ 6.) She was discharged on December 22 with a diagnosis of "acute encephalitis with severe mental status changes with resolution of all neurological symptomatology." (Administrative Record at 388.) Her discharge summary reported that

> [b]y the time [the patient-Plaintiff] was brought to the emergency room the patient was profoundly confused and within 12 hours of admission the patient's mental status had reverted to that of a 2-3 year-old. She was able only to repeat the work [*sic*] "mommy." The patient also had hypesthesia in which the lightest touch on her skin resulted in harsh piercing screams.

(*Id.* at 389.) She then underwent various tests and "markedly improved within 2 days." (*Id.*) By the time of discharge on December 22, Plaintiff was "back to her baseline." (*Id.*) The discharge summary reports that Plaintiff

> [i]s ambulating the halls without assistance. She is pulse ox at 96% on room air. She is articulate. Her memory is unaffected at least since her recovery. She still has little to no recollection of her situation during her acute hospital phase. CAT scan and MRI, with a without [*sic*] contrast, revealed normal brain architecture.
> The patient at this point has stable vital signs and blood pressure of 124/70, temperature 97.1, heart rate 82 and regular, respiratory rate 18 and unlabored satting at 96% by my own testing on room air. The patient is awake, alert and oriented, and in no acute distress.

3

(*Id.*)

Plaintiff's last day of work was December 17, 2012: the day before her hospitalization. (Pl.'s Statement of Facts at ¶ 7.) After her discharge, she proceeded to apply for STD benefits. She also began to visit her primary care physician, Dr. Sean McCall. The first medical record from Dr. McCall submitted to the Administrative Record is dated January 2, 2013 for a follow-up exam to Plaintiff's hospital visit. (*See* Administrative Record at 279-82.) Dr. McCall wrote that Plaintiff was "here today complaining of some difficulty with memory, panic attacks, leg weakness since being discharged from Moses. Condition has been improving since hospitalization." (*Id.* at 279.) Dr. McCall diagnosed Plaintiff in relevant part with "Viral Encephalitis Late Effect" and with memory loss. (*Id.* at 281.) As to the latter, he indicated that he planned to "set her up" for speech therapy and explained:

> Speech therapy evaluation will be for working on memory recall and relearning certain tasks better. There are no technical speech difficulties per se. Will also set her up . . . for a neuropsych eval for baseline and monitoring in the future. Have advised at least a month off of work and forms were filled out indicating such.

(*Id.* at 281.) Dr. McCall also characterized the viral encephalitis as "improving." (*Id.*)

Plaintiff's next visit with Dr. McCall occurred on January 24, 2013. (*See id.* at 283-85.) She is described as "having issues with forgetting words and not able to complete sentences at times," and as "[s]till having panic attacks out in public." (*Id.* at 283.) Though she "[h]as been able to navigate driving to the local grocery store and gas station," she "[a]ttempted to go [*sic*] Target but had a severe panic attack while on the highway and the

4

busier parking lots at the mall." (*Id.*) She presented as "[f]eeling about the same compared to last visit." (*Id.*) The notes go on to describe her as "a good historian" with "clear and understandable" articulation, who "communicates normally" and has "fluent" speech "with ideas clearly conveyed." (*Id.* at 284.)[1]

In another follow-up exam on February 19, 2013, Dr. McCall noted that Plaintiff "[f]eels better compared to last visit. Condition has been improving since last visit. Onset was sudden. Rated as moderate. Reports associated anxiety." (*Id.* at 286.) He also commented that Plaintiff "seems to be improving. She is undergoing eval and treat with speech pathology to hopefully reverse some of the issues from her encephalitis. She is to be out of work until further notice." (*Id.* at 288.) Exam notes for March 13, 2013 note much the same issues, though they add that Plaintiff "[r]eports associated confusion and speaking difficulty." (*Id.* at 289.) They also note that Plaintiff is

> improving slowly. She recently saw the neuropsych at Allied who agreed there are some deficits in her cognition from her illness. He did say she could go back part time[2] but would need to have breaks if things got too stressful with her. At this point, I think its best to keep Monica out until further notice at our next visit to see how much better she is doing with her speech pathology therapy.

(*Id.* at 291.)

Dr. McCall's March 28, 2013 notes state that Plaintiff is "[f]eeling about the same compared to last visit." (*Id.* at 292.) But, somewhat inconsistently, he went on to write that

---

[1] Except for the notation "communicates normally," this evaluation is repeated in the notes for later visits. (*See* Administrative Record at 287, 290, 293, 296, 299, 302.)

[2] URS later confirmed that it was unable to accommodate a part-time employee, and that it "must have a full release to duty with no restriction." (Administrative Record at 350.)

her "[c]ondition has been uncontrolled since last visit" and that she "[r]eports associated agitation, change in memory, difficulty concentrating, depression, easily distracted, memory loss and speaking difficulty." (*Id.*) She would also "frequently word search and sometimes even slur her words during the interview." (*Id.* at 293, 296.) Dr. McCall concluded that Plaintiff's memory loss is "about the same. She is participating with speech path. I have recommended she be out of work due to cognitive difficulties that exist now that were not present prior to her encephalitis. I have advised her to seek disability." (*Id.* at 294.) April 29, 2013 examination notes note the same issues, adding only that there has been "minimal improvement subjectively" to Plaintiff's memory loss. (*See id.* at 295-97.) Likewise, May 20, 2013 notes add that Plaintiff is "improving but very slowly. Still very poor with calculations. Anxiety level high dealing with driving in the city." (*See id.* at 298-300.) The last examination note from Dr. McCall is dated June 24, 2013 and, after noting all the same issues reported previously, comments that Plaintiff "appears to being [*sic*] doing well today and has been compliant with her therapy. She is still having great difficulty completing things due to memory lapses. Still can't drive any type of distance without fear and is petrified about driving in the city." (*Id.* at 301-03.) In a letter to Aetna as part of Plaintiff's STD benefits claim, discussed below, Dr. McCall reiterated his conclusions, stating:

> [Plaintiff] is recovering from viral encephalitis. She has late effects of this disease which include memory loss and cognitive disorder. She is currently going for speech and cognitive therapy but is not yet ready to return to work. She will continue with this therapy until such time that they feel she has reached her full potential and attained her goals. Due to the memory loss and cognition problems she cannot function in the capacity of her job.

6

(*Id.* at 365.)

The record reflects that Plaintiff attended such therapy with Speech-Language Pathologist Catherine Colosimo on February 6, 2013. (*See id.* at 415-25.) Ms. Colosimo's Initial Evaluation notes gave Plaintiff a "Speech Diagnosis" of "Higher Level Aphasia" and concluded that "[t]he patient communicates with mild difficulties in receptive language." (*Id.* at 421.) That form provided multiple descriptions of behavior, from which Ms. Colosimo could check the description that most closely matched Plaintiff's behavior. Ms. Colosimo selected the following description: "The patient communicates adequately in most situations however subtle deficits become apparent in distracting settings. Decreased ability to reason, use good judgment in an emergency situation, and/or to tolerate stress may be noted. The patient is able to initiate and maintain conversation with an occasional error." (*Id.*) She also noted decreased auditory memory, decreased auditory comprehension, decreased visual memory, and decreased reading comprehension, all of which she found support the diagnosis of "receptive aphasia." (*Id.* at 423.) The record contains notes of follow-up therapy sessions, in which Ms. Colosimo states that Plaintiff has "divided attention" and completed other exercises in attention, auditory/visual memory, and reading comprehension. (*See id.* at 445-448.)

As also referenced in Dr. McCall's notes, Plaintiff underwent a "comprehensive neuropsychological evaluation" with Dr. Michael Raymond on February 13, 2013. (*See id.* at 329-337.) The consultation notes state that this evaluation was prompted by Dr. McCall's

7

own referral. (*See id.* at 329.) The evaluation consisted of a series of tests, including interviews, intelligence and memory tests, and tests of Plaintiff's various sensory perceptions, which Dr. Raymond found to render "a reliable sample of Ms. Marchegiani's current level of adaptive functioning." (*Id.* at 333.) Dr. Raymond found that "[b]y history (educational/vocational) and cognitive data obtained, it appears that Ms. Marchegiani premorbidly functioned in the average/high average range of general intelligence." (*Id.*) With this benchmark in mind, he found that Plaintiff fell below anticipated levels in terms of her attention/concentration, information processing speed, auditory discrimination of rhythmic sounds, manual motor speed, and visual executive functions. (*Id.*)

Ultimately, however, Dr. Raymond concluded that "with a reasonable degree of neuropsychological certainty, [Plaintiff's test results] are essentially unremarkable for noteworthy neurocognitive deficits, and in particular, memory difficulty." (*Id.* at 335.) He noted that "these findings stand in contrast with Ms. Marchegiani's subjective neurocognitive complaints" and that, "based on slowed processing speed, she may not be as cognitively efficient now as she was prior to her encephalitis in December, 2012." (*Id.*) However, her test results "suggest functional and rather intact cognitive abilities." (*Id.*) He therefore concluded that "[f]ortunately, her overall prognosis is favorable." (*Id.*) He recommended continued treatment and stated that "Ms. Marchegiani presents with the requisite cognitive abilities to consider a gradual return to gainful employment," which "may include an initial

return on a part-time basis with monitoring of her performance by her immediate supervisor." (*Id.* at 336.)

Plaintiff applied to Aetna for STD benefits, which were first approved on January 14, 2013 for the period of December 18, 2012 through February 18, 2013. (*Id.* at ¶ 8 (citing Administrative Record at 178).) The benefit period was extended on March 1, March 21, and May 3, 2013. (*Id.* at ¶¶ 9-11 (citing Administrative Record at 183, 201, 220).)

As part of the determination process, in addition to the sources cited above, Aetna received another neuropsychological review of the record by another Aetna provider, Dr. Elana Mendelssohn, Psy.D. (Defs.' Statement of Facts at ¶ 29 (citing Administrative Record at 112).) Dr. Mendelssohn's review appears to be entirely done on the written record. Her report first discusses and summarizes Drs. McCall and Raymond's records and conclusions. (*See* Administrative Record at 354.)[3] Dr. Mendelssohn went on:

> In reviewing these records, it is important to note that cognitive difficulties were not indicated at the time of the claimant's discharge from the hospital in 12/12; yet, she has continued to report various cognitive and speech problems to her treating provider. Multiple notes from this provider indicated intact mental status findings despite her reported complaints. A neuropsychological evaluation was also completed which did not reveal cognitive deficits or significant psychopathology. Rather it was noted that test performance was not consistent with her subjective complaints. Nevertheless, the treating provider recommended disability. Yet, documentation from this provider did not include specific clinical findings or description of direct and observed behaviors to substantiate the presence of impaired neuropsychological function. As such, the information does not support the

---

[3] Plaintiff denies Defendants' representations of Dr. Mendelssohn's report, solely on the grounds that "[t]he findings of Dr. Mendelssohn, who only reviewed records, were arbitrary and capricious." (Pl.'s Resp. to Defs.' Statement of Facts, Doc. 31, at ¶ 30.) But whether her conclusions are reliable or not, it is clear from the undisputed record that she did in fact make them.

presence of functional impairment from either an organic or mental/nervous perspective.

(*Id.* at 354-55.)

Aetna also requested that its "Behavioral Health Unit ('BHU') review Plaintiff's medical records including [Dr. McCall's March 28] letter, March 18 and March 28 office visit notes, March 28, 2013 [Attending Physician Statement from Dr. McCall], and speech therapy notes from Colleen Colosimo." (Defs.' Statement of Facts at ¶ 21 (citing Administrative Record at 92).) Following review, BHU reported that it was

> unable to recommend support of functional impairments from a psychological perspective at this time. The clinical information submitted doesn't substantiate impairments which would preclude the [Plaintiff] from performing essential duties as a Supply Technician from a psychological perspective. The clinical information that was submitted relates to the effects of medical diagnosis. Although the [Plaintiff] is having cognitive impairments the provider reported that cognitive difficulties that exist now were not present prior to her encephalitis. No significant cognitive impairments were reported, vegetative symptoms or the results of a mini mental status exam. To perfect this claim, it would be helpful for the provider to submit clinical information with observable cognitive, emotional or behavioral exam findings related to the diagnosis that would preclude work ability. Exam findings and observations may include the following: unrelenting tearfulness, inability to compose self without the support of the Practitioner, emotional lability [*sic*], impairments in concentration such as the inability to follow a three step command, or difficulty completing operations of serial 7s or 3s.

(Administrative Record at 93.)[4]

On May 16, 2013, Aetna denied STD benefits effective May 4, 2013, on the stated basis that "there are insufficient findings to support your inability to perform the essential

---

[4] Plaintiff denies this representation for similar reasons to those noted in footnote 3, *supra*. Again, the record is considered here solely to show that these conclusions were offered, and not to determine whether they were valid.

elements of your occupation." (*See* Defs.' Statement of Undisputed Material Facts at ¶ 31;

Administrative Record at 224.) Its denial letter cited the statements in Plaintiff's discharge

summary from Moses Taylor Hospital and in Dr. McCall's diagnostic notes that stated that

Plaintiff had articulate, fluent, and clear speech and unaffected memory. (Administrative

Record at 224.) The letter also cited the results of Dr. Raymond's neuropsychological

evaluation, noting that that evaluation found Plaintiff's memory and intellectual functioning to

be within the normal range and that Dr. Raymond suggested that Plaintiff consider a gradual

return to work. (*Id.*) It concluded:

> You are paid for short term disability from 12/18/2012 through 05/03/2013.
> We are unable to continued [*sic*] your short term disability benefits as of
> 05/04/2013. The neuropsychological evaluation did not provide significant
> psychological impairments which would preclude you from performing the
> normal duties of your job as a Supply Technician which entails performing
> inventory management, storage management, cataloging, [and] property
> utilization related to depot, local or other supply activities. Your provider did
> not include specific clinical findings or descriptions of direct and observed
> behaviors to substantiate the presence of impaired neuropsychological
> function. Therefore, your short term disability benefits are denied effective
> 05/04/2013.

(*Id.*)

Plaintiff appealed this decision on May 28, 2013. (*See* Administrative Record at 125,

227.) As part of her appeal, she sent Aetna documents consisting of "additional office visits

notes and letters from her doctors as well as rehab notes and [a] prescription list." (Defs.'

Statement of Facts at ¶ 38 (citing Administrative Record at 140).) Among these is a June

11

26, 2013 letter from Dr. McCall which states that Plaintiff continue to suffer from the after

effects of her viral encephalitis. (Administrative Record at 278.)[5] It elaborates:

> While her speech may seem normal at times she continues to have deficits in situations where there are distractions. Because of her decreased processing skills she cannot focus with any degree of efficiency when put in a situation where there are distractions such as other people talking or other distractions. She also cannot process complex auditory or written directions with any degree of efficiency. She was sent for speech and language therapy to Allied Services but unfortunately before she could reach her goals she was discharged because she reached her maximum number of visits with her insurance company. She was discharged on a home program but her progress without a rehab therapist is slow.
>
> In my opinion she is not yet ready to function at her or any other job. She has obvious functional deficiencies which would not be conducive to performing a task of any complexity or duration. I have included medical records of her therapy and visits here in our office. She is seen in our office approximately every 3 weeks or more often as needed. She will continue on her present medications and at home therapy. . . .

(*Id.* at 278.) Likewise, Catherine Colosimo submitted a report that summarized the results of

her sessions with the Plaintiff. (*Id.* at 277.) That report stated that Plaintiff had not met her

therapy goal and concluded: "The patient communicates adequately in most situations,

however, mild deficits become apparent in distracting situations due to decreased

processing skills. Additional therapy is recommended, however, the patient completed all

sessions allowed by her insurance company." (*Id.*)

Plaintiff also submitted a job description of a "CBA Supply Technician," though it is

unclear from the record where this document originated. (*Id.* at 275.) Nonetheless, the

---

[5] Plaintiff denies all of Defendants' Statements of Fact regarding the appeal. But once again, she does so almost entirely by asserting that all appellate actions were arbitrary and capricious. The Court disregards these conclusory denials and looks only to what the undisputed record shows occurred.

description states that a Supply Technician "[u]ses a thorough knowledge of supply regulations and policies to perform a wide variety of complex assignments related to maintaining specialized property accounts and records, completing individual transactions, providing customer assistance, screening reference files, conducting data searches, and distributing output files." (*Id.*) It goes on to describe with greater specificity the tasks that a Supply Technician would be required to complete, which require some level of cognitive functioning. (*See id.*)

Aetna received two additional independent medical reviews on appeal, both of which are accompanied by "Conflict of Interest Attestations" that disavow a connection between the reviewing physician and any of the parties or their affiliates and further affirm that the reviewing physicians received no outcome-dependent compensation for their work on the case. (*See generally id.* at 263-73.)

First, Dr. John Brusch, a specialist in Infectious Disease, reviewed the records previously discussed in this Opinion. (*See id.* at 264-66.) According to his report, Dr. McCall refused to speak with him and informed him "that the insurance company would have to speak to [Dr. McCall's] lawyers." (*Id.* at 264.) No other discussions with other professionals were reported; Dr. Brusch's review appears to have consisted only of the written record. He concluded:

> Based on the provided documentation, functional impairment is not supported from 05/04/2013 through 06/15/2013.
> On numerous examinations done by Dr. McCall, there have been no significant neurological or physical abnormalities documented. In the latest

available examination of 6/20/13, there were no signs of acute distress at present. She was alert and oriented no involuntary movements. The patient was cooperative, relaxed and happy. Articulation is clear and understandable. Speech was fluent with her ideas clearly conveyed. There were no abnormalities on neurological system documented. Her mood was said to be normal. Speech was articulate and fluent. Achilles and patellar DTRs were brisk and symmetrical. Her cranial nerves were grossly intact. There are no neurological or functional limitations.

(*Id.* at 265.) He later reiterated in the same report that "there is no evidence of any significant cognitive disorder in this patient." (*Id.*) He appears to dispute the diagnosis of encephalitis in its entirety, noting that Plaintiff's tests and examinations were normal, such that "any claim for disability is based on the claimant's symptoms and not the objective evidence that he [*sic*] is well documented in the submitted record." (*Id.*)

Second, Dr. Lawrence Burstein, a specialist in psychology reviewed the documents previously discussed in this Opinion. (*See* Administrative Record at 269-70.) He also spoke with Ms. Colosimo and Dr. Raymond, but not Dr. McCall, for reasons unspecified in his report. (*Id.* at 271-72.) He ultimately concluded that "the information does not support impairment in the claimant's psychological functioning, likely to have impaired her occupational functioning, during the period under review." (*Id.* at 272.) The stated justifications for this conclusion were that Dr. Raymond's neuropsychological "findings were inconsistent with the claimant's complaints of significant impairment;" that Dr. McCall and Ms. Colosimo "did not provide findings to support [their] opinions" of cognitive impairment, "especially findings of the authority of performance-based testing found in the neuropsychological evaluation;" and that the "mild decrement in [Plaintiff's] processing

14

speed" that Ms. Colosimo reported by telephone to Dr. Burstein "might slow the claimant's

performance ten to 15 percent below her peers" but was not shown to cause "impairment in

her psychological functioning that would preclude her from performing a specific

occupational task." (*Id.*)

On August 23, 2013, Aetna sent Plaintiff a letter upholding its original decision on

appellate review. (*See id.* at 244-45.) Its explanation for this decision reads as follows:

> Our review revealed that your seen monthly by Dr. McCall since your
> hospitalization. Examination notes indicated clear understandable articulation
> without any signs of acute distress. Documentation from Ms. Colosimo
> indicates the presence of cognitive problems on May 20, 2013. As indicated
> previously this documentation, the information from Ms. Colosimo conflicts
> with the observation of Dr. McCall. The medical information on file at this time
> fails to provide medical evidence of quantified, measurable, functional
> impairments of a physical, cognitive, emotional, or behavioral nature.

(*Id.* at 245.)

### III.   Procedural History

Plaintiff initiated this ERISA action on March 25, 2014. On May 28, 2014, she filed an

Amended Complaint against Aetna and her employer, URS Federal Services. (*See* Am.

Compl., Doc. 13.) That Complaint alleges that Aetna arbitrarily and capriciously denied

Plaintiff's claims by relying on erroneous information, refusing to credit Plaintiff's reliable

evidence of disability, and acting out of its own pecuniary interest instead of the best interest

of its beneficiary. (*See id.* at ¶¶ 20-31.) The Amended Complaint then asserts claims for

Short-Term Disability Benefits under ERISA section 1132(a)(1)(B) (Count I) and for

Attorney's Fees and Costs under ERISA section 1132(g) (Count II). Cross-Motions for

15

Summary Judgment were then filed on January 8, 2015, (see Docs 24; 25), which are currently before the Court.

On November 4, 2014, the parties stipulated that the standard of review of the Administrative Record in this case is the "arbitrary and capricious" or "abuse of discretion" standard. (Stipulation, Nov. 4, 2014, Doc. 20, at 1.) The Court approved that stipulation the same day. (See Order, Nov. 4, 2014, Doc. 21, at 1.) Therefore, on summary judgment we evaluate Aetna's actions for an abuse of discretion.

## IV.  Summary Judgment Standard

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). Therefore, the non-moving party may not oppose summary judgment simply on the basis of

the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S.

at 248.

> A party asserting that a fact cannot be or is genuinely disputed must support
> the assertion by citing to particular parts of materials in the record . . . or
> showing that the materials cited do not establish the absence or presence of
> a genuine dispute, or that an adverse party cannot produce admissible
> evidence to support the fact.

Fed. R. Civ. P. 56(c)(1)(A)-(B). In evaluating whether summary judgment should be granted,

"[t]he court need consider only the cited materials, but it may consider other materials in the

record." Fed. R. Civ. P. 56(c)(3). "Inferences should be drawn in the light most favorable to

the non-moving party, and where the non-moving party's evidence contradicts the movant's,

then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,

974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party

only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380, 127

S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007). If a party has carried its burden under the

summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical
> doubt as to the material facts. Where the record taken as a whole could not
> lead a rational trier of fact to find for the nonmoving party, there is no genuine
> issue for trial. The mere existence of some alleged factual dispute between
> the parties will not defeat an otherwise properly supported motion for
> summary judgment; the requirement is that there be no *genuine* issue of
> *material* fact. When opposing parties tell two different stories, one of which is
> blatantly contradicted by the record, so that no reasonable jury could believe
> it, a court should not adopt that version of the facts for purposes of ruling on a
> motion for summary judgment.

17

*Id.* (internal quotations, citations, and alterations omitted).

## V.     Analysis

"We review a challenge by a participant to a termination of benefits under ERISA §

502(a)(1)(B) [codified at 1132(a)(1)(B)] under an arbitrary and capricious standard where . .

. the plan grants the administrator discretionary authority to determine eligibility for benefits."

*Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 844 (3d Cir. 2011) (collecting cases). "An

administrator's decision is arbitrary and capricious 'if it is "without reason, unsupported by

substantial evidence or erroneous as a matter of law."'" *Id.* at 845 (quoting *Abnathya v.*

*Hoffman-La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir 1993)).

Plaintiff argues that this Court evaluate Aetna's denial under a "heightened standard

of review" in which the traditional "arbitrary and capricious" standard is modified based on

certain exacerbating factors. According to the Plaintiff, a "cause for a heightened review is

demonstrated by procedural irregularity, bias, or unfairness in the review of a claimant's

application for benefits." (Pl.'s Br. in Supp. of Mot. for Summ. J., Doc. 28 at 2 (citing *Leonard*

*v. Educators Mut. Life Ins. Co.*, 620 F. Supp. 2d 654 (E.D. Pa. 2007)).) Such heightened

review is appropriate here, she argues, because "Defendant's reviewer accepted the

diagnosis of the Plaintiff's treating doctors and specialists, but then rejected the portions of

each doctor and specialist 42 days prior to the expiration of short term disability benefits."

(*Id.* at 8.)

18

The cases that the Plaintiff cites for this position rely on a "sliding scale" approach under which "the level of scrutiny should be more penetrating when there is greater suspicion of partiality and less penetrating the smaller that suspicion." *Porter v. Broadspire & Comcast Long Term Disability Plan*, 492 F. Supp. 2d 480, 485 (W.D. Pa. 2007), *cited at* Pl.'s Br. in Supp. of Mot. for Summ. J. at 8; *see also Addis v. Limited Long-Term Disability Program*, 268 Fed. App'x 157, 160 (3d Cir. 2008), *cited at same*. However, the Third Circuit has explicitly abandoned the sliding scale approach in compliance with the Supreme Court's later decision in *Metropolitan Life Insurance Co. v. Glenn*, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008). *See Doroshow v. Hartford Life & Accident Ins. Co.*, 574 F.3d 230, 233 (3d Cir. 2009); *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009). As the Circuit explained:

> in light of *Glenn*, our "sliding scale" approach is no longer valid. Instead, courts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in considering whether the administrator or the fiduciary abused its discretion.

*Estate of Schwing*, 562 F.3d at 525.[6] We will follow the Third Circuit's directive here, and therefore apply the arbitrary and capricious standard outright, without modification.

---

[6] Plaintiff does not phrase her claims for a heightened standard explicitly in terms of "conflict of interest," but only references "procedural irregularity, bias, or unfairness." (*See* Pl.'s Br. in Supp. of Mot. for Summ. J. at 2.) Nonetheless, *Leonard*, the case from which the "procedural irregularity, bias, or unfairness" quote originated, discussed these issues in reliance on the same line of cases abrogated in *Glenn*. *See Leonard*, 620 F. Supp. 2d at 669-70. Thus, it appears that Plaintiff does seek to invoke the abrogated "conflict of interest" cases.

When we do so, it becomes clear that Aetna's decision was not "without reason, unsupported by substantial evidence, or erroneous as a matter of law." *Miller*, 632 F.3d at 845.

Indeed, significant evidence existed to support Aetna's decision. Three physicians— one affiliated with Aetna (Mendelssohn) and two independent (Brusch and Burstein)— reviewed the medical files and all came to the same conclusion that Plaintiff was not sufficiently disabled to warrant continued STD benefits. These three physicians all support their conclusions with information that appears on the face of the record, such as the fact that Moses Taylor Hospital's discharge notes reported that Plaintiff was "back to her baseline" and that testing during her hospitalization showed no abnormalities; that Dr. Raymond's evaluation concluded that Plaintiff had average neuropsychological functioning and that Dr. Raymond himself recommended that Plaintiff "consider a gradual return to gainful employment;" that Dr. McCall's reports of Plaintiff's subjective complaints and symptoms were not supported by the results of any objective testing; and that even Dr. McCall's own notes indicated that Plaintiff behaved normally during her examinations. All of these are facts of record available to Aetna that provide substantial evidence to justify its denial, even if the physicians had never invoked them.

Plaintiff's attacks on this evidence are unconvincing. First, she argues that "the Defendant selectively reviewed the evidence by failing to consider opinions of treating physicians and gave more weight to the review of its own file consultant. The Defendant

20

further skewed procedural aspects of the claim in its favor, and ignored or misunderstood diagnoses." (Pl.'s Br. in Supp. of Mot. for Summ. J. at 3.) She further argues that "[t]he utilization by the Defendant of the opinion of consultants or a physician who never examined the Plaintiff was arbitrary and capricious." (Id. at 7.)

"Plan administrators . . . may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834, 123 S. Ct. 1965, 1972, 155 L. Ed. 2d 1034 (2003). But at the same time, "courts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Id. Here, we see no reason to conclude that Aetna's decision to discount Dr. McCall's conclusions was arbitrary and capricious. For one reason, his conclusions are somewhat belied by his own notes, which, as recounted above, variously describe Plaintiff as someone who "communicates normally," is "a good historian," and uses "clear and understandable" articulation and "fluent" speech "with ideas clearly conveyed." (See supra p. 5 & n. 1.) While this discrepancy is not dispositive by itself, the fact that Dr. McCall's conclusions are at some odds with his observations gives Aetna a nonarbitrary justification for discounting his conclusions.

But perhaps even more important are Dr. Raymond's conclusions. As discussed above, Dr. Raymond personally evaluated the Plaintiff, which evaluation was even

prompted by Dr. McCall's own referral. Dr. Raymond concluded that Plaintiff's test results were "essentially unremarkable for noteworthy neurocognitive deficits, and in particular, memory difficulty." (*Id.* at 8.) He noted that, even if Plaintiff had some diminished capacity, her test results "suggest functional and rather intact cognitive abilities" and therefore rendered an overall favorable prognosis. (*Id.* at 8-9.)

Aetna explicitly relied on Dr. Raymond's findings in its denial. (*Id.* at 11.) In doing so, it relied on objective test results from a neuropsychologist who not only met with and examined Plaintiff personally, but whose input was requested by Plaintiff's only other treating physician. Therefore, Plaintiff cannot argue that Aetna arbitrarily refused to credit treating physicians. To the contrary, Aetna appears to have credited the in-person reports that it reasonably found convincing and discounted those that were contradicted by other evidence of record. There is nothing "arbitrary and capricious" about such an evaluation.

Finally, Plaintiff argues that it was arbitrary and capricious for Aetna to accept Plaintiff's medical reports "up to just 42 days prior to the expiration of the Plaintiff's short term disability benefits" and then reverse itself and terminate those benefits "without any chan[g]e in the Plaintiff's condition." (Pl.'s Br. in Supp. of Mot. for Summ. J. at 7.) These actions, she argues "were specifically designed to not allow the Plaintiff to reach the full 180 days of short term disability benefits in order to allow the Plaintiff to file for long term disability benefits." (*Id.*)

22

These arguments, however, are mere speculation unsupported by any indications in the record that Aetna acted with the motive ascribed. The record shows that Aetna continued to gather evidence over the period of disability and sought out additional opinions before making its final determination. When Aetna made its first payments to the Plaintiff, Dr. McCall's progress notes, Dr. Raymond's evaluation, and Dr. Mendelssohn and the BHU's record reviews had not even been created yet. Once these reports were generated, they provided substantial evidence to deny Plaintiff's claims that did not exist at the beginning of the benefit period. The fact that Aetna waited to procure and consider this evidence before it made its determination adequately accounts for the 138 day time lag between its initial grant and its later denial, and renders Plaintiff's speculation wholly unconvincing.

But even if, in the alternative, we were to credit Plaintiff's speculative assertions and agree that evidence exists to ascribe ill motives to Aetna's denial decision, this would not alter the fact that the record contains ample objective evidence supporting its decision. When the Court reviews for abuse of discretion, our role is not to determine whether Aetna made the correct decision, or whether we would have evaluated evidence the same way, had we been in Aetna's place. Our only role is to determine whether Aetna's decision was "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Miller*, 632 F.3d at 845. Because ample evidence supports Aetna's decision, that decision

cannot be considered arbitrary and capricious as a matter of law. Summary judgment must accordingly be entered in favor of the Defendants.

## VI.    Conclusion

For the reasons stated above, Plaintiff's Motion for Summary Judgment (Doc. 24) is **DENIED** and Defendants' Motion for Summary Judgment (Doc. 25) is **GRANTED**. A separate Order follows.

Robert D. Mariani
United States District Judge

24